UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF OKLAHOMA

In re:                                      )
                                            )
MICHAEL L. CALLOWAY, SR.. and               )      Case No. 09-16011-SAH
LILLIE E. CALLOWAY,                         )      Chapter 7
                                            )
    Debtors,                                )
_____             )
                                            )
RED RIVER ROOFING AND                       )
CONSTRUCTION, INC.                          )
                                            )
    Plaintiff,                              )
                                            )
v.                                          )      ADV No. 10-01043-SAH
                                            )
MICHAEL L. CALLOWAY, SR. and                )
LILLIE E. CALLOWAY,                         )
                                            )
    Defendants.                             )

---

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
COMBINED WITH BRIEF IN SUPPORT**

---

David L. Nunn, OBA #14512

- Of the Firm -

DAVID L. NUNN, P.C.
P. O. Box 230
Edmond, Oklahoma 73083-0230
(405) 330-4053
(405) 330-8470 (fax)
ATTORNEY FOR PLAINTIFF

# TABLE OF CONTENTS

**Page**

Motion for Summary Judgment .................................................................1

Brief in Support .........................................................................1

I.  Background Facts .................................................................1

II.  Statement of Undisputed Material Facts ........................................2

III. Arguments and Authorities ...................................................11

    1.  Plaintiff Need Only Prove False Oath
        By a Preponderanceof Evidence Standard...............................11

    2.  Debtors Have Not Fully and Truthfully
        Disclosed Their Prepetition Business Dealings ........................11

        A.  Debtors Have Made False Oaths in Their SOFA About
            Companies They Have Owned Within the Prior Six Year Period ....................11

        B.  Debtors Have Not Told the Truth
            About Their Business Dealings with VEMAC ...................................14

    3.  Debtors Have Not Fully and
        Truthfully Disclosed Their Interests in Other Assets .............................18

        A.  Debtors Failed to Disclose Their Interest In Life Insurance Policies ................18

        B.  Debtors Failed to Disclose Their Interest in Certain Bank Accounts...............19

        C.  Debtors Failed to Disclosed Their Interest in Their Trust .................................20

        D.  Debtors Failed to List in Their SOFA $36,129.92 in Insurance Losses.............21

        F.  Debtors Testified Falsely at Their Meeting of Creditors
            About the Disposition of Insurance Proceeds Received from State Farm ........22

    4.  Debtors Have Made False Oaths About Their Prepetition Income .........................24

        A. Debtors Have Falsely Reported Their Income in Their SOFA ...........................24

B.Debtors' Lifestyle Shows They Have Under Reported Their Income ......................24

5.  Debtors' False Oaths Were Made With the Requisite
    Requisite Fraudulent Intent and Justify the Denial of Discharge ................................26

6.  Debtors Have Admitted That They Should be Denied
    a Discharge Under 11 U.S.C. § 727(a)(4) ....................................................................28

IV. Conclusion .....................................................................................................................29

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                    **Page**

Aetna Ins. Co. v. Nazarian (In re Nazarian), 18 B.R. 143 (Bankr. D. Md, 1982......................11, 27

Bank of India v. Sapru (In re Sapru), 127 B.R. 306 (Bankr. E.D. N.Y. 1991)...............................27

Boroff v. Tully (In re Tully), 818 F.2d 106 (1st Cir. 1987).................................................18, 24, 28

Cadle Co. v. King (In re King), 272 B.R. 281 (Bankr. N.D. OK 2002)................11, 13, 25, 27, 28

Calder v. Job (In re Calder), 907 F.2d 953 (10th Cir. 1990)..........................................11, 13, 18, 26

Chalik v. Moorefield (In re Chalik), 748 F.2d 616 (11th Cir. 1984)......................11, 13, 19, 25, 26

Community Bank of Homewood-Floosmoor v. Bailey (In re Bailey),
    145 B.R. 919 (Bankr. N.D. Ill. 1992) ......................................................................28

Crane v. Morris (In re Morris), 302 B.R. 728 (Bankr. N.D. Okla. 2003)......................................24

Dana Fed. Credit Union v. Holt (In re Holt), 190 B.R. 935 (Bankr. N.D. Ala. 1996)...................18

Grogan v. Garner, 498 U.S. 279, 111 S. Ct. 654, 112 L.Ed.2d 755 (1991)...................................11

Guardian Indus. Prod., Inv. v. Diodati (In re Diodati), 9 B.R. 804 (Bankr. D. Mass 1981)..........17

Ingersoll v. Kriseman (In re Ingersoll), 124 B.R. 116 (M.D. Fla. 1991) ....................12,13, 26, 28

Kaye v. Hirsch (In re Hirsch), 14 B.R. 59 (Bankr. S.D. Fla. 1981)..........,.......................21, 22, 27

Lissach Enterprises, Inc. V. Braidis (In re Braidis), 27 B.R. 470 (Bankr. E.D. Penn. 1983).........22

In re Mascolo, 505 F.2d 274 (1st Cir. 1974)....................................................................19, 25, 26

Montey Corp. v. Maletta (In re Maletta), 159 B.R. 108 (Bankr. D. Conn 1993)......................15, 28

Sergent v. Haverland (In re Haverland), 150 B.R. 768...........................................................17, 23

Tillery v. Hughes (In Matter of Hughes), 184 B.R. 902 (Bankr. E.D. La. 1995)..........................13

In re Vega, 15 B.R. 174 (Bankr. W.D. Okla. 1981).................................................................18, 21

iv

## TABLE OF AUTHORITIES
### (Cont.)

**Page**

Woolman v. Wallace (In re Wallace), 289 B.R. 428 (Bankr. N.D. Okla 2003).........................1, 12

**STATUTES**

11 U.S.C. § 523 (a)...........................................................................................................................1

11. U.S.C. § 727 (a)(4) .................................................................1, 10, 11, 12, 13, 18, 27, 28, 29


**RULES**

Fed R. Bankr. P. 9037 (a)................................................................................................................2

Fed R. Civ. P 56 .............................................................................................................................1

Western District Rule LCvR56.1 ...................................................................................................1

## Motion for Summary Judgment

Plaintiff, Red River Roofing and Construction, Inc. ("Red River Roofing), pursuant to Fed. R. Civ. P. 56 (made applicable by Fed. R. Bankr. P. 7056), and Western District Rule LCvR56.1), moves for summary judgment against Defendants on its claims under 11 U.S.C. § 727(a)(4)[1]. Based upon the pleadings, affidavits and exhibits filed herewith, there is no substantial controversy as to any material fact and Plaintiff is entitled to judgment as a matter of law against Defendants Michael L. Calloway, Sr. and Lillie E. Calloway.

## Brief in Support

## I. BACKGROUND FACTS[2]

Debtors own a 4,292 square foot home which they had custom built in 2000 for approximately $400,000.00. The house is located at 19445 Sportsman Road, Edmond, Oklahoma, 73013 ("Calloway Property"). In 2008, the Calloway Property was damaged by one or more hail storms. State Farm Fire and Casualty insured the property and adjusted the Calloways' damage claims. Red River Roofing was contracted by Mr. Calloway to put a new roof on the Calloway Property. He represented to Red River Roofing that it would be paid from the insurance proceeds that the Debtors would be receiving. Red River Roofing properly

---

[1] At the court's August 5, 2010 scheduling conference, the court stated that the § 727(a) claims would be tried first, and if Plaintiff prevailed, the ruling and judgment would be dispositive of the entire case (including § 523(a) claims). Therefore, even though this motion does not address Plaintiff's 11 U.S.C. § 523(a) claims or claims under § 727(a)(2),(a)(3), and (a)(5), it should be considered a "full" summary judgment motion. This is so because a ruling in favor of Plaintiff on its § 727(a)(4) claims will end this case. Woolman v. Wallace (In re Wallace), 289 B.R. 428, 433 (Bankr. N.D. Okla. 2003) ("If a single ground for denial of discharge is established, the inquiry ends").

[2] The below background facts (among others) were stipulated to in the parties' August 5, 2010 Status Report submitted to the court for the August 5,2010 Scheduling Conference. The court is requested to review its Status Report to confirm a stipulation to the same. (Per court order, the parties were instructed not to file the Status Report).

completed the job, and invoiced Mr. Calloway on or about February 11, 2009. Mr. Calloway did not pay for the roof as agreed. On June 1, 2009, Red River Roofing sued Mr. Calloway and obtained a judgment in Oklahoma County, Case No. CJ-2009-5056 (the "Judgment"). As of March 26, 2010, the amount owed on the Judgment is $22,543.99.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Debtors filed bankruptcy on October 26, 2009. They filed the Petition, Schedules, and Statement of Financial Affairs ("SOFA")referenced below. They were signed under oath - under penalty of perjury. Debtors were asked at their meeting of creditors if there were any errors or omissions that they wished to bring to the trustee's attention. Debtors said "no."

**Voluntary Petition, Schedules ("Schedules"), and Statement of Financial Affairs ("SOFA") (Item No. 10) Appendix PX-1 (pp. 34 and 44, of 65)[3]; Transcript of Meeting of Creditors Appendix PX-2, p. 4, lines 9-25, p. 5, Line 1, p. 6, Line 6 through 16.**

2. On June 3, 1996, debtor Michael L. Calloway (with another person) incorporated A Plus Medical Care Inc. A Plus Medical Care, Inc. was suspended by the Oklahoma Secretary of State on June 17, 2005. A Plus Medical Care of Oklahoma, Inc. was incorporated by Mr. Calloway on December 19, 2005. It was in good standing as of August 19, 2010. Debtors reported in their SOFA (item No. 18) that A Plus Medical Care of Oklahoma, Inc.'s business ended in January 2009. No disclosure is made with respect to A Plus Medical Care, Inc. Deposits made in A Plus Medical Care's JP Morgan Chase Bank account for the period of February 2009 through July 2009, total $12,339.70. In their SOFA, Debtors report A Plus Medical Care of Oklahoma, Inc.'s address to be 2801 Coltrane Place, Suite 2, Edmond,

---

[3] Unless otherwise noted, redactions appearing in Appendix Exhibits were made by Plaintiff's counsel in order to comply with Fed. R. Bankr. P. 9037(a).

OK 73034.

**See copy of Certified Copy of Certificate of Incorporation for A Plus Medical Care Inc., Appendix PX-3; Copy of Certified Copy of Oklahoma Secretary of State Certificate of Suspension for A Plus Medical Care Inc. Appendix PX-4; See Copy of Certified Copy of Certificate of Incorporation for A Plus Medical Care of Oklahoma, Inc., Appendix PX-5; Copy of Oklahoma Secretary of State Certificate of Good Standing for A Plus Medical Care of Oklahoma, Inc., Appendix PX-6; Statements for Chase Account No.  xxxxxx4001 for the following statement periods from 1/31/2009- 2/27/2009 Appendix PX-7; 2/28/2009 - 3/31/2009 Appendix PX-8; 5/1/2009- 5/29/2009 Appendix PX-9; 7/1/2009-7/15/2009, Appendix PX-10; SOFA (Item No. 18) Appendix PX-1 (p. 41 of 65).**

3. In addition to A Plus Medical Care, Inc. and A Plus Medical Care of Oklahoma, Inc, within the six (6) year period preceding their bankruptcy, one or more of the Debtors also had an interest in the following Oklahoma companies:

| Company | Date of Incorporation | Other | Exh. |
|---|---|---|---|
| Medical Enterprises, Inc. | 8/4/1999 | Michael Calloway, Sr., An Incorporator and Registered Agent<br><br>Reinstated June 23, 2008--see PX-27. | 11 |
| High Expectations, LLC | 7/5/2005 | Stephen Dyer, Service Agent<br><br>Principal place of business:<br>19445 Sportsman Road<br>Edmond, OK 73003[4] | 12 |
| Part-time Services LLC | 1/5/2007 | Michael Calloway, Sr., Incorporator and Registered Agent | 13 |
| The Next Level Sports Management, Inc. | 9/5/2007 | Michael L. Calloway, Director<br><br>Christian Brim CPA, Incorporator.<br><br>In Good Standing With Secretary of State as of August 23, 2010. | 14 |
| All in One Property Management Services, Inc. | 1/15/2008 | Michael Calloway, Director/President<br><br>Christian Brim CPA, Incorporator. | 15 |

---

[4] This is Debtors' address of record.  Debtor Michael L. Calloway's relationship with Mr.  Dyer goes back to at least July 2005.

3

| Perception Consulting, Inc. | 2/21/2008 | Michael L. Calloway, Director/President<br><br>Christian Brim CPA, Incorporator. | 16 |
|---|---|---|---|
| Perception Consulting, LLC[5] | 9/11/2008 | Stephen E. Dyer, Service Agent<br>Principal Place of Business:<br>2801 Coltrane Place, Suite 2<br>Edmond, OK 73034<br><br>Michael L. Calloway, Director/President | 17 |
| All in One Property Management Services, LLC | 9/11/2008 | Steven E. Dyer, Service Agent<br>Principal Place of Business:<br>2801 Coltrane Place, Suite 2<br>Edmond, OK 73034 | 18 |

Debtors' sworn SOFA (item 18) required that they disclose the name, address and tax payer identification number of any entity in which they were, in the six (6) year period preceding their bankruptcy filing, either an officer, director, or partner, (among other things), or owned 5% or more of the voting or equity securities. Debtors listed only A Plus Medical Care of Oklahoma, Inc[6]. Debtors did not list the eight other companies.

**See Copy of Certified Copy of Certificate of Incorporation for A Plus Medical Care Inc., Appendix PX-3; See Copy of Certified Copy of Certificate of Incorporation for A Plus Medical Care of Oklahoma, Inc., Appendix PX-5; Copies of Certified Copy of Documents from Secretary of State, Appendix PX-11 through 18; Copy of Arkansas Secretary of State Certified Copies of all Corporate Records on File for A Plus Medical Care of Arkansas, Inc., Appendix PX-19; Copy of Oklahoma Secretary of State Certificate of Good Standing for The Next Level Sports Management, Inc. Appendix PX-20; Copy of Arkansas Secretary of State Certified Copies of all Corporate Records on File for Macsco, Appendix PX-21; TFCU Account Agreement Appendix PX-22; SOFA (item No. 18), Appendix PX-1 (p. 41 of 65).**

---

[5] This company (only) was mentioned in Debtors' schedule B.

[6] There is/was also a medical equipment sales company incorporated in Arkansas by CPA Christian Brim called "A Plus Medical Care of Arkansas, Inc." Reginald McElroy is/was the registered service agent. Mr. Calloway's mother's maiden name is McElroy. See the TFCU Account Agreement referenced in support of this alleged undisputed fact. Reginald McElroy is a relative of Mr. Calloway. There is/was also an Arkansas medical equipment sales company called Macsco, for which Mr. McElroy is the registered service agent.

4. On March 7, 2008, APMC, Inc. doing business as A Plus Medical of Oklahoma, filed a federal court lawsuit (Western District of Oklahoma, Case No. 5:08-cv-00249-L) against officials of the Oklahoma Health Care Authority ("OHCA") ("APMC Lawsuit"). APMC, Inc. was attempting to halt/reverse the setoff/recoupment against APMC receivables by OHCA starting in the fall of 2007. APMC, Inc. is owned 100% by Debtors[7]. An administrative closing order was entered in the APMC lawsuit on December 11, 2008. The APMC Lawsuit was dismissed with prejudice on February 4, 2009.

**Complaint from APMC Lawsuit Appendix PX-23; Corporate Disclosure Statement (from APMC Lawsuit), Appendix PX-24; Docket Sheet for APMC Lawsuit, Appendix PX-25; AMPC Dismissal Appendix PX-26.**

5. Medical Enterprises, Inc. ("MEI") was incorporated by Mr. Calloway in 1999. MEI was reinstated with the Oklahoma Secretary of State on June 23, 2008. Stephen Dyer organized Premier Providers, LLC on December 11, 2008. VEMAC, LLC (aka VEMAC Group) was organized by Stephen Dyer on February 5, 2009. Like A Plus Medical Care of Oklahoma, Inc., VEMAC, LLC, and Premier Providers, LLC are both medical supply companies. They each have a registered office address of 2801 Coltrane Place, Ste. 2, Edmond, Oklahoma. A Plus Medical Care of Oklahoma, Inc. transferred its medical supply inventory, computers, furniture and fixtures to VEMAC, LLC (and reportedly in January 2009). These assets were "insured" (and therefore of significant value). From about May 1, 2009 through August 20, 2009, Debtors received at least $16,750.00 for the sale of assets to VEMAC (one check (PX-33) even states "Payment on Purchase of A Plus Assets"). Debtors' SOFA states that the value received for the

---

[7] Plaintiff's counsel has been unable to locate an Oklahoma company known as APMC, Inc. This company is, based upon the dba name and other documents attached hereto, obviously either A Plus Medical Care, Inc. or A Plus Medical Care of Oklahoma, Inc. If APMC, Inc. is some different entity, it is not disclosed in Schedule B (item 13) or Debtors' SOFA (Item No. 18). See Appendix, PX-1 (p. 8 of 65, and 41 of 65).

transfer was "$0.00."   This is a materially false statement made knowingly and with intent to deceive.

**Copy of Oklahoma Secretary of State Certificate of Good Standing for Medical Enterprises, Inc., Appendix PX-27; Certified Copy of Articles of Organization for Premier Providers, LLC, Appendix PX-28; SOFA (item No.  10) Appendix PX-1 (p. 39 of 65); Transcript of Meeting of Creditors, Appendix PX-2, p. 14, lines 5-9; Copy of Certified Copy of Articles of Organization and Trade Name Report (for VEMAC, aka VEMAC Group), Appendix, PX-29; VEMAC Checks, Appendix PX-30 through PX-37; SOFA (item No.  10), Appendix PX-1 (p.  39 of 65).**

6.  According to internet advertising found on VEMAC Group, VEMAC is reportedly a "Multistate Provider of Medical Equipment and Supplies" (emphasis added), consisting of Macsco, MEI, and Premier Providers.  At his 2004 examination, Michael Calloway testified that he did not know VEMAC prior to his transfer to VEMAC of A Plus Medical of Oklahoma, Inc.'s medical supply inventory, computers, furniture and fixtures.   Shortly after the transfer, debtor Michael Calloway did paid consulting work for VEMAC because it "needed assistance with clientele[8]."

**Internet Advertising for VEMAC Group, Appendix PX-38; Transcript of 2004 Examination Appendix PX-39, p. 98, Lines 19-25, p. 99, lines 1-23.**

7.  At Debtors' Meeting of Creditors, debtor Michael Calloway testified that VEMAC, LLC was owned by Stephen Dyer.  At his 2004 examination, debtor Michael Calloway testified untruthfully that he did not know who owned VEMAC, LLC.

**Transcript of Meeting of Creditors, Appendix PX-2, p.  12, lines 7-10; Transcript of 2004 Examination Appendix PX-39, p. 97, Lines 8-15; Copy of Certified Copy of Articles of Organization and Trade Name Report (for VEMAC, aka VEMAC Group), Appendix, PX-29.**

---

[8] With a transfer in January 2009, this work was obviously done pre-bankruptcy.  Debtors' SOFA (item No.  1) solicited the "source" of income from employment or operation of business.  Debtors did not disclose VEMAC as a source of income.  In fact, Debtors do not disclose the source of any of their income (They merely repeat the category heading provided by the SOFA).

8. Debtors paid at least the aggregate amount of $3,931.63 to Lincoln National Life Insurance Company ("Lincoln National"), American General Life ("AGL"), and others during the period of December 2008 through October 2009. One of the payments to Lincoln National was drafted the very day they filed bankruptcy, i.e., October 26, 2009. One or both of the Debtors had an interest in undisclosed life insurance policies on the date they filed bankruptcy.[9] Debtors' schedule B, item No. 9 required them to disclose their interests in life insurance policies. Debtors stated "none." This was not the truth.

**Recapitulation of Actual Life Insurance Expenses, Appendix PX-40, with supporting attachments; Schedule B (item No. 9) Appendix PX-1 (page 8 of 65).**

9. Debtors' _**reported**_ income from all sources for the following periods is as follows:

2009 (YTD)--$38,433.91;
2008------------$33,165.00; and
2007------------$50,444.00.

Debtors' prepetition monthly mortgage payments total $4,911.74. Debtors' vehicle payments total $563.00 per month. (Debtors' Statement of Intention states that they intend to reaffirm on these debts). Debtors were current on these payments when they filed bankruptcy.

**SOFA (Items 1, 2, and 7) Appendix PX-1 (pp. 35-36 of 65); Schedule J, Appendix PX-1 (p. 32 of 65); Chapter 7 Individual Debtor's Statement of Intention, Appendix PX-1 (pp. 45-47 of 65); Excerpt from Transcript of Meeting of Creditors Appendix PX-2, p. 11, lines 1 through 5.**

10. Between October 24, 2008 through June 1, 2009, Debtors paid (at least) $23,973.49 for the education/sports training of one or more of their children:

IMG Academy (in Florida)($14,500.00);
St. Leo's University (in Florida) ($5,800.99); and

---

[9] Debtors' life insurance payments for the reported eleven month period averages out to be $352.00 per month. The court should note Debtors' schedule J (PX-1, page 32 of 65) reports life insurance expenses of $41.67 per month.

Kace King ($3,672.50) (a sports tutor with Tutoring Headquarters, LLC).

IMG Academies is a sports academy. Debtors claim in their SOFA that their 2008 income was

$33,165.00 and their year to date 2009 income was $38,433.91.

**Recapitulation of Actual Tuition/Sports Training Expenses, Appendix PX-40, with supporting attachments; IMG Academies Internet Material Appendix PX-41; St. Leo University Internet Material, Appendix PX-42; Internet Material on Tutoring Headquarters, LLC, Appendix PX-43; Undisputed Fact No. 9).**

11. Within one year of Debtors' October 26, 2009 bankruptcy filing, Debtors made two

claims with State Farm Fire and Casualty for which they received $36,129.92. Debtors' SOFA

(item No. 8), required them to disclose "all losses from fire, theft, or other casualty or gambling

within one year..." of their bankruptcy. Debtors stated: "None." This was not the truth.

**State Farm Fire and Casualty Check for $30,465.63, Appendix PX-44; State Farm Fire and Casualty Check for $5,664.29, Appendix PX-45; SOFA (Item No. 8), Appendix PX-1 (p. 38 of 65).**

12. At their Meeting of Creditors, Debtors testified falsely (under questioning from

attorney Mark L. Hoose) that, with the exception of $5,000.00 paid to Red River Roofing, all of

the State Farm insurance money was taken by their mortgage company. They further testified

that they did not spend any of the insurance money except for $5,000.00 paid to Red River. This

was not the truth. Their mortgage company did not take any of that money. Debtors deposited

the check for $30,465.63 into their TFCU Account, No. xxxxxx9737, and spent the same on their

living, including payments to St. Leo Academy.

**Transcript of Meeting of Creditors Appendix PX-2, p. 7, line 7 through p. 9, line 10; Statement for TFCU Account No. xxxxxxx9737 for 3/13/09 through 3/31/09, Appendix PX-46; Statement for TFCU Account No. xxxxxxx9737 for 4/1/09 through 4/30/09, Appendix PX-47.**

13. Within the one year prior to Debtors' October 26, 2009 bankruptcy filing, debtor

8

Michael L. Calloway, Sr. had an interest in a JP Morgan Chase Bank account (no. xxxxxxxxxxx2114). From October 7, 2008 through June 4, 2009, total deposits to this account were $5,389.00. Approximately $5,445.49 in money from this account was spent in Florida on one or more of their son's college living expenses. This account is not listed as either an "open" account in Debtors' Schedule B (item 2), nor is it listed as a "closed" account in Debtors' SOFA (item No. 11).

**Statements for Chase Account No. xxxxxxxxxxx2114 for following periods: 10/7/2008 - 11/6/2008, Appendix PX-48, 11/7/2008 -12/4/2008, Appendix PX-49, 12/5/2008-1/7/2009, Appendix PX-50, 1/8/2009 - 2/5/2009, Appendix PX-51, 2/6/2009-3/5/2009, Appendix PX-52, 3/6/2009-4/6/2009, Appendix PX-53, 4/7/2009-5/6/2009, Appendix PX-54, 5/7/2008-6/4/2009, Appendix PX-55; Schedule B (item No. 2) Appendix PX-1 (p. 7 of 65); SOFA (item No. 11) Appendix PX-1 (p. 39 of 65).**

14. Within one year of Debtors' October 26, 2009 bankruptcy filing, debtor Michael L. Calloway, Sr. had an interest in a JP Morgan Chase Bank account (no. xxxxxxxxxxx4235). From October 1, 2008 through June 30, 2009, total deposits to this account were $200.00. Approximately $2,826.00 from this account was spent in Florida on one or both of their son's college living expenses. This account is not listed as either an "open" account in Debtors' Schedule B (item 2), nor is it listed as a "closed" account in Debtors' SOFA (item No. 11).

**Statements for Chase Account No. xxxxx4235 for following periods: 10/1/2008 -10/31/2008, Appendix PX-56, 11/1/2008-11/28/2008, Appendix PX-57; 11/29/2008-12/31/2008, Appendix PX-58, 1/1/2009-2/27/2009, Appendix PX-59, 2/28/09-3/31/2009, Appendix PX-60, 4/1/2009-6/30/2009, Appendix PX-61; Schedule B (item No. 2) Appendix PX-1 (p. 7 of 65); SOFA (Item No. 11) Appendix PX-1 (p. 39 of 65).**

15. Within one year of Debtors' October 26, 2009 bankruptcy filing, debtor Lillie E. Calloway had an interest in a Tinker Federal Credit Union ("TFCU") account (no. xxxxx0248). This account is not listed as either an "open" account in Debtors' Schedule B (item 2), nor is it listed as a "closed" account in Debtors' SOFA (item No. 11).

9

**Statements for TFCU Account No. xxxxxx0248 for following periods: 3/13/2009 -3/31/2009, Appendix PX-62, 4/1/2009-6/30/2009, Appendix PX-63, 7/1/2009 - 9/30/2009, Appendix PX-64, 10/1/2009 - 12/31/2009, Appendix PX-65; Schedule B (item No. 2) Appendix PX-1 (p. 7 of 65); SOFA (item No. 11) Appendix PX-1 (p. 39 of 65).**

16.   Debtors have an interest in The Michael L. Calloway and Lillie E. Calloway revocable Trust Dated 7-19-02 ("Calloway Trust") (and in fact, own their home through that trust). Schedule B, item No. 20, required Debtors to disclose any interest they hold in a trust. Debtors said "none." This was untruthful. Deposits to the Calloway Trust to two trust bank accounts for the eleven month period of December 2008 through October 2009, total $154,189.16. When the $36,129.92 (i.e., the State Farm insurance money) is deducted out, this leaves $118,059.24. This averages out to be $10,732.65 per month in income. The month they filed bankruptcy (October 2009), there was deposited into one of these accounts $7,785.37. Debtors report that their monthly income was only $2,779.80 and their 2009 year to date income was only $38,433.91.

**See Quit Claim deed, Appendix PX-66; Schedule B (Item No. 20) Appendix PX-1 (p. 9 of 65); Revocable Trust Cash Flow Chart, Appendix PX-67, with supporting attachments; Schedule B (item No. 2) Appendix PX-1 (p. 7 of 65); Schedule I Appendix PX-1(p. 30 of 65); SOFA (item Nos. 1 and 2) Appendix PX-1 (pp. 36-37 of 65). SOFA (item No. 11) Appendix PX-1 (p. 39 of 65).**

17. On June 3, 2010, Plaintiff served upon Debtors certain request for admissions under Fed. R. Civ. P. 36. Debtors' responses were due no later than July 6, 2010. They did not respond. Debtors have admitted that they should be denied a discharge under 11U.S.C. § 727(a)(4).

**See Plaintiff's First Request for Admissions, First Interrogatories, and First Request for Production of Documents to Defendants, mailed June 3, 2010, Appendix PX-68.**

### III.  ARGUMENTS AND AUTHORITIES

1.

**Plaintiff Need Only Prove False Oath By a
Preponderance of Evidence Standard.**

11 U.S.C. § 727(a)(4) states that:

(a) The court shall grant the debtor a discharge, unless–....

(4) the debtor knowingly and fraudulently, in or in connection with the case--

(A) made a false oath or account.

"[T]he false oath must relate to a material matter and must be made willfully with intent to defraud." Calder v. Job (In re Calder), 907 F.2d 953, 955 (10th Cir. 1990). "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." Id. quoting Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984).  These elements need only be proven by a preponderance of the evidence.  Cadle Co.  v.  King (In re King), 272 B.R. 281, 288 (Bankr. N.D. OK 2002) citing Grogan v. Garner, 498 U.S. 279, 111 S.  Ct.  654, 112 L.Ed.2d 755 (1991). To meet the burden under § 727(a)(4), a creditor is not required to prove that a debtor intended to injure creditors.  Chalik, 748 F.2d at 618.  A creditor is not required to prove that creditor relied to its detriment on information sworn to falsely by the debtor.  Aetna Ins. Co. v. Nazarian (In re Nazarian), 18 B.R. 143, 146 (Bankr. D. Md. 1982).

2.

**Debtors Have Not Fully and Truthfully Disclosed
Their Prepetition Business Dealings.**

A.     Debtors Have Made False Oaths In Their SOFA About Companies They Have
Owned Within the Prior Six Year Period.

11

"The purpose of 11 U.S.C. § 727(a)(4)(A) is to insure that sufficient facts are available to all persons interested in the administration of the bankruptcy estate without requiring investigations or examinations to discover whether the information provided is true." Ingersoll v. Kriseman (In re Ingersoll), 124 B.R. 116, 122 (M.D. Fla. 1991). After the suspension of A Plus Medical Care, Inc., Michael Calloway incorporated a company with a similar sounding name - A Plus Medical Care of Oklahoma, Inc. (Undisputed Facts, ¶ 2). This entity was still in "good standing" with the Oklahoma Secretary of State as of August 19, 2010. (Undisputed Facts, ¶ 2).

A false oath made in the debtor's statement of financial affairs may satisfy the "false oath" requirement under § 727(a)(4). Woolman v. Wallace (In re Wallace), 289 B.R. 428, 434 (Bankr. N.D. Okla. 2003). Debtors' sworn SOFA (item 18) required that they disclose the name, address and tax payer identification number of any entity in which they were, in the six (6) year period preceding their bankruptcy filing, either an officer, director, or partner, (among other things), or owned 5% or more of the voting or equity securities. One or both of the Debtors have held an interest in at least eight companies that they failed to disclose in their SOFA. (Undisputed Facts, ¶s 2and 3). Six of these companies were incorporated either by CPA Christian Brim or have Stephen Dyer as the service agent. (Undisputed Facts, ¶ 3)[10]. The Next Level Sports Management, Inc. was still in good standing with the Oklahoma Secretary of State

---

[10] It also seems implausible that the Arkansas medical equipment sales company called "A Plus Medical Care of Arkansas, Inc." does not have some ownership connection to these Debtors. Michael L. Calloway used to live in Arkansas (see schedule F, p. 27 of 65, listing student loan debt to University of Arkansas), the name is similar, the incorporator (Christian Brim) is a person who incorporated three companies in which one or both of the Debtors have an interest, and the registered service agent has the last name identical to Michael Calloway's mother's maiden name. (Undisputed Facts, ¶ 3 (supporting footnote 6).

12

as of August 23, 2010 (Undisputed Facts, ¶s 2-3). The failure to list stock in a corporation, even worthless stock, supports a denial of discharge. See King, 272 B.R. at 300. So does a debtor's failure to disclose in his SOFA his involvement with corporations. Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618-19 (11th Cir. 1984); Tillery v. Hughes (In Matter of Hughes), 184 B.R. 902, 910 (Bankr. E.D. La. 1995).

**That these companies are worthless has not been established by the Debtors.** However, even if they are, "the debtor has an obligation to disclose the existence of all assets, even if they are worthless or unavailable." Ingersoll, 124 B.R. at 122. "[A] 'recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted...information concerned a worthless business relationship or holding; such a defense is specious." Calder, 907 F.2d at 955, quoting Chalik, 748 F.2d at 618. The Debtors have not amended their SOFA (despite this issue being raised in the Complaint), and in fact have testified that no amendments are necessary. (Undisputed Facts, ¶ 1).

Debtors' SOFA (item 18), makes no disclosure of A Plus Medical Care, Inc., and falsely reports A Plus Medical Care of Oklahoma, Inc. to have ended its business in January, 2009. (Undisputed Facts, ¶ 2). Deposits made in A Plus Medical Care's JP Morgan Chase Bank account for the period of February 2009 through July 2009, total $12,339.70. (Undisputed Facts, ¶ 2). These deposits belong to one of these companies. Obviously some one of them was earning or collecting money well after January 2009. The APMC Lawsuit was still active until February 5, 2009. (Undisputed Facts, ¶4). In light of these deposits (among other reasons), the failure to list these companies in the SOFA was a material omission. This court could deny the Debtors their discharge on this point alone.

B.    <u>Debtors Have Not Told the Truth About Their Business Dealings With VEMAC</u>.

The below time line leading up to the VEMAC transfer is curious, and will be analyzed

below after presentation of other facts:

Fall 2007 - A Plus Medical Care of Oklahoma, Inc.'s receivables are setoff/recouped by the OHCA (Undisputed Facts, ¶ 4);

March 7, 2008 - APMC files APMC lawsuit to halt/recover setoffs by OHCA (Undisputed Facts, ¶ 4);

June 23, 2008 - MEI reinstated with Oklahoma Secretary of State (Undisputed Facts, ¶ 5);

December 11, 2008 - Administrative Closing Order entered in APMC Lawsuit (Undisputed Facts, ¶ 4);

December 11, 2008 - Premier Providers organized by Stephen Dyer with Oklahoma Secretary of State (Undisputed Facts, ¶ 5);

January 2009 - A Plus Medical Care of Oklahoma, Inc. reportedly transfers assets for $0.00 to VEMAC (VEMAC organized February 5, 2009) (Undisputed Facts, ¶ 5);

February 4, 2009 - APMC Lawsuit dismissed with prejudice (Undisputed Facts, ¶ 4);

February 5, 2009 - VEMAC, LLC, dba VEMAC Group organized with Oklahoma Secretary of State (Undisputed Facts, ¶ 5).

At Debtors' Meeting of Creditors, debtor Michael Calloway testified that VEMAC, LLC

was owned by Stephen Dyer (under questioning from attorney Mark L. Hoose):

Q.    It shows in January of 2009 that you transferred to VEMAC, LLC medical supplies, inventory, computers, furniture and fixtures, and you valued that at zero dollars and you indicated you received nothing for that. Who is VEMAC, LLC?
A.    It's a medical corporation.
Q.    Who owns that corporation?
A.    Stephen Dyer.

Transcript of Meeting of Creditors, Appendix PX-2, p. 12, lines 3-10. A false oath made at a

2004 exam may satisfy the "false oath" requirement under § 727(a)(4). <u>Montey Corp. v.</u>

<u>Maletta (In re Maletta)</u>, 159 B.R. 108, 112 (Bankr. D. Conn. 1993). Debtor Michael Calloway

testified falsely at his 2004 exam under questioning from the below counsel:

> Q.    Are you an owner of some interest in VEMAC, LLC?
> A.    As I answered three, four hours ago, I own nothing.
> Q.    Who owns VEMAC, LLC?
> A.    You got to look that up.
> Q.    Does Steven Dyer own it?
> A.    I don't know who owns it.

Transcript of 2004 Examination Appendix PX-39, p. 97, Lines 8-15. Also doubtful is the stated

reason for the VEMAC transfer. Mr. Calloway testified at his 2004 exam (when questioned by

below counsel):

> Q.    Why, sir, would A Plus Medical of Oklahoma, Inc. give medical supply
>       inventory, computers, furniture and fixtures, why would it give it away to
>       an LLC that it does not know?
> A.    Because I own the company. That is my business, and I can do what I
>       want to do with it.

Transcript of 2004 Examination, Appendix PX-39, p. 98, lines 19-24. Michael Calloway then

testified that he did paid consulting work for VEMAC after the transfer to VEMAC because it

"needed assistance with clientele." (Undisputed Facts, ¶ 6) and Transcript of 2004 Examination,

Appendix PX-39, p. 99, lines 16-17. Mr. Calloway's explanation for why he essentially gifted

valuable insured assets (undisputed Facts, ¶ 5) to VEMAC is neither believable, nor the truth.

***<u>Debtors received at least $16,750.00 for the transfer. (Undisputed Facts, ¶ 5). Debtors' stated</u>***

***<u>falsely in their sworn SOFA that they received nothing for the transfer (Undisputed Facts, ¶</u>***

***<u>5), and Mr. Calloway also  testified falsely to that effect at his 2004 exam.</u>*** This was done with

intent to deceive.

      Mr. Calloway also gave false testimony about MEI's corporate status.

Q.    When did you own Medical Enterprises, Inc.?
A.    Years ago.
Q.    When did you cease to own an interest in Medical Enterprises, Inc.?
A.    I don't know the exact year, sir.
Q.    Was anybody else a co-owner with you?
A.    I don't know.  Could have been my wife.  I don't know.
Q.    Is there anybody else that you are aware of that might have owned an interest in Medical Enterprises, Inc.?
A.    No, sir.
Q.    Did you cease to be an owner of Medical Enterprises, Inc.?
A.    What do you mean by ceased?
Q.    Do you own today, do you own an interest in Medical Enterprises, Inc.?
A.    I own nothing today, sir.
Q.    When did you cease to be an owner of Medical Enterprises, Inc.?
A.    For the fourth time, I don't know.
Q.    But you know that you don't own an interest today?
A.    Yes.
Q.    How did they get reinstated by the Secretary of State on June 23, 2008?
A.    You got to ask the Secretary of State.  I don't know.

See Excerpt from 2004 Examination, Appendix PX-39, p. 101, line 21 through p. 102, line 23.

Again, this testimony is not believable - Mr. Calloway owned MEI, possibly his wife owned an interest, and he does not know of anyone else who might have owned an interest.  The court should note the seemingly lack of surprise or concern that his company was supposedly reactivated by a third person and without his knowledge or consent.  This is simply not the way the real world works.  Strangers do not generally reinstate defunct corporations.  Yet, Mr. Calloway would have us believe that he does not know who reinstated MEI which he and Mrs. Calloway were the only known owners.

At their Meeting of Creditors, Debtors testified as follows (under questioning from Mr. Hoose):

Q.    But this income basically shows that you are earning $2,779.80 per month and your mortgage payments alone are $4,911.74 per month?
A.    We was current on everything before we filed.
Q.    It shows that you made payments in August, September and October to Bank of America on your first mortgage totaling $9,519.75.  And it shows

16

> you made payments in August, September and October of 2009 to Bank of
> America on the rental property in the amount of $2,671.47. That is
> $11,000.00 - approximately $12,000.00 in total payments. Where did that
> money come from?
> LILLIE CALLOWAY: Our earnings.
> MICHAEL CALLOWAY: Our business and my  - what you call it?  My
> retirement account.

See Excerpt from Transcript of Meeting of Creditors, Appendix PX-2, p.  11, lines 3 through 18.

What "business" were the Debtors' operating?  No active business is disclosed in their SOFA.

The Debtors have not amended their Schedules of SOFA to list any such "business" or business

income, and in fact have testified that no amendments are necessary.  (Undisputed Facts, ¶ 1).

"A fundamental purpose of § 727(a)(4)(A) 'is to ensure that dependable information is

supplied  for those interested in the administration of the bankruptcy estate on which they can

rely without the need for the trustee or other interested parties to dig out the true facts in

examinations or investigations.'"  Sergent v.  Haverland (In re Haverland), 150 B.R. 768, 770,

quoting Guardian Indus. Prod., Inc. v. Diodati (In re Diodati), 9 B.R. 804, 807 (Bankr. D. Mass.

1981).

It is noteworthy that VEMAC Group and Premier Providers, LLC are both medical

supply companies with their registered offices listed as 2801 Coltrane Place, Ste.  2, Edmond,

Oklahoma.  (Undisputed Facts, ¶ 3).  This is the same address as A Plus Medical Care of

Oklahoma, Inc.  (Undisputed Facts, ¶ 2).  One day after the APMC lawsuit is dismissed  with

prejudice (February 4, 2009--Undisputed Facts, ¶ 4) VEMAC is organized (Undisputed Facts, ¶

5).  Debtors transfer the A Plus Medical Care of Oklahoma assets to VEMAC and receive at

least $16,750.00 for the transfer, yet report "0.00" to the bankruptcy court.  (Undisputed Facts, ¶

5).  Mr.  Calloway did paid consulting work for VEMAC after the asset transfer.  (Undisputed

Facts, ¶ 6).  Mr.  Calloway denies knowing who reinstated MEI even though he and Mrs.

17

Calloway are the only known owners.  MEI is reportedly part of VEMAC Group, according to internet advertising.  (Undisputed Facts, ¶ 6).  Mr.  Calloway falsely testifies at his 2004 exam that he does not know who owns VEMAC, even though he clearly knew this at the Meeting of Creditors.  (Undisputed Facts, ¶ 7).  It is unclear exactly what is really going on here, and Plaintiff does not profess to have it all figured out to date.  But nor does Plaintiff have to figure this out to the last detail.  What is clear however, is that the Debtors have not truthfully and fully disclosed the nature of their prepetition business and financial dealings.

3.

### Debtors Have Not Fully and Truthfully Disclosed Their Interests in Other Assets.

A.      Debtors Failed to Disclose Their Interest in Life Insurance Policies.

A debtor has a duty to prepare "meticulous" schedules.  See In re Vega, 15 B.R. 174, 176 (Bankr.  W.D. Okla.  1981).  These schedules must provide "'complete, truthful and reliable information.'"  Calder, 907 F.2d at 956 quoting Boroff v.  Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987).  A false oath made in the debtor's schedules may satisfy the "false oath" requirement under § 727(a)(4).  Dana Fed.  Credit Union v.  Holt (In re Holt), 190 B.R. 935, 939 (Bankr. N.D. Ala.  1996).

Debtors paid at least $3,872.35 to Lincoln National and AGL, and others during the period of December 2008 through October 2009:

| Date | Bank | Amount | Payee | |
|------|------|--------|-------|---|
| 12/23/2008 | Chase | $604.35 | Lincoln National | |
| 1/16/2009 | Chase | $59.28 | Lincoln National | |
| 1/5/2009 | Chase | $331.50 | Lincoln National | |

18

| 3/9/2009 | Chase | $663.60 | Lincoln National | |
| 7/23/2009 | TFCU | $663.60 | Lincoln National | |
| 9/1/2009 | TFCU | $331.50 | Lincoln National | |
| 10/26/2009[11] | TFCU | $221.20 | Lincoln National | |
| 5/26/2009 | TFCU | $312.00 | AGL | |
| 8/20/2009 | TFCU | $137.80 | AGL | |
| 10/7/2009 | TFCU | $137.80 | AGL | |
| 11/21/2008 | Chase | $229.00 | Selected Funeral and Life Ins. | |
| 1/15/2009 | Chase | $240.00 | National Benefit Life | |

(Undisputed Facts, ¶ 8). One of the payments to Lincoln National was drafted the very day they filed bankruptcy, i.e., October 26, 2009. One or both of the Debtors had an interest in one or more life insurance policies on the date they filed bankruptcy. (Undisputed Facts, ¶ 8). Debtors' schedule B, item No. 9 required them to disclose their interests in life insurance policies. Debtors stated "none.[12]" (Undisputed Facts, ¶ 8). This is a materially false statement by both Debtors under oath.

> B.    Debtors Failed to Disclose Their Interest in Certain Bank Accounts.

"In re Mascolo, 505 F.2d 274, 277-78 (1st Cir. 1974), holds that '[m]atters are material if pertinent to the discovery of assets, including the history of a bankrupt's financial transactions... Therefore, knowing and fraudulent omission of a bank account, whether or not it is closed at the time of filing, warrants the denial of discharge." Chalik, 748 F.2d 618 quoting In re Mascolo, 505 F.2d 274, 277-78 (1st Cir. 1974).

---

[11] The court should note that this payment was drafted the same day Debtors' filed bankruptcy. Obviously, the Debtors' had an active policy when they filed bankruptcy.

[12] Debtors' life insurance payments for the reported eleven month period averages out to $352.00 per month. The court should note Debtors' schedule J, Appendix PX-1 (page 30 of 65) reports life insurance expenses of $41.67 per month.

Within the one year prior to Debtors' October 26, 2009 bankruptcy filing, debtor Michael L. Calloway, Sr. had an interest in the following bank accounts: (1)  JP Morgan Chase Bank account (no. xxxxxxxxxxx2114); and (2)  JP Morgan Chase Bank account (no. xxxxxxxxxxx4235).  These bank accounts were not disclosed in Debtors' schedule B (item 2, requiring bank accounts to be disclosed). (Undisputed Facts, ¶s 13-14).  Furthermore, they were not listed in Debtors' Statement of Financial Affairs (item No.  11) as closed accounts. (Undisputed Facts, ¶ 13-14).  The non-disclosure of these accounts is material because it is from them that we see appreciable amounts of financial support (at variance with reported income) going to one or more of their sons attending school in Florida. (Undisputed Facts, ¶s 13-14).

Within one year of Debtors' October 26, 2009 bankruptcy filing, debtor Lillie E. Calloway had an interest in a Tinker Federal Credit Union ("TFCU") account (no. xxxxxx0248). (Undisputed Facts, ¶ 15).  This bank account was not disclosed in Debtors' schedule B (item 2, requiring bank accounts to be disclosed). (Undisputed Facts, ¶ 15).  It was not listed in Debtors' SOFA (item No.  11) as a closed account.  (Undisputed Facts, ¶ 15).  These three accounts are part of the Debtors' financial history, collectively refute their sworn income statements, and are therefore material.  See Chalik, 748 F.2d at 618 (information pertaining to Debtors' financial history is "material").

C.   Debtors Failed to Disclose Their Interest in Their Trust.

Debtors have an interest in The Calloway Trust (and in fact, own their home through that trust). (Undisputed Facts, ¶ 16).  It is not known what assets are in this trust.  Deposits to the Calloway Trust bank accounts for the period of December 2008 through October 2009, total $154,189.16.  (Undisputed Facts, ¶ 16).  When the State Farm insurance money (i.e., $36, 129.92) is deducted this leaves $118,059.24.  (Undisputed Facts, ¶ 16). (This averages out to be

20

$10,732.65 per month in income). The month they filed bankruptcy (October 2009), there was deposited into one of these accounts $7,785.37. (Undisputed Facts, ¶ 16). Debtors report that their monthly income was only $2,779.80 and their 2009 year to date income was only $38,433.91. (Undisputed Facts, ¶ 16). Schedule B, item No. 20, required Debtors to disclose any interest they hold in a trust. (Undisputed Facts, ¶ 16). Debtors said "none." (Undisputed Facts, ¶ 16). To say the least, the non-disclosure of the Calloway Trust adds to the mounting and substantial evidence that Debtors have not made full and accurate disclosures of their income, assets, debts, and business transactions[13].

D.      Debtors Failed to List In Their SOFA $36,129.92 in Insurance Losses.

Within one year of Debtors' October 26, 2009 bankruptcy filing, Debtors had two claims with State Farms Fire and Casualty for which they received $36,129.92, as follows:

| Date of Loss | Claim No. | Check Amount | Exh. |
|---|---|---|---|
| 11/5/2008 | 36-F387-111 | $30,465.63 | 44 |
| 7/6/2009 | 36-4629-304 | $5,664.29 | 45 |

(Undisputed Facts, ¶ 11). Debtors' SOFA (item No. 8), required them to disclose "all losses from fire, theft, or other casualty or gambling within one year..." of their bankruptcy. (Undisputed Facts, ¶ 11). Debtors stated: "None." (Undisputed Facts, ¶ 11). Again, a debtor is required to file meticulously prepared schedules. Vega, 15 B.R. at 176. Even less deliberate omissions combine with others to show a pattern by the debtors which is evidence of "debtors'

---

[13]      Bankruptcy schedule B., item No. 3 required Debtors to describe and value their "Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collectors or collectibles." It is axiomatic that Debtors own items included within this list. Debtors stated "none." Schedule B, Appendix PX-1(p. 8 of 65). Debtors' schedules have not been prepared with the requisite meticulous care. Vega, 15 B.R. at 176. Even less deliberate omissions combine with others to show a pattern by the debtors which is evidence of "debtors' wrongful intent in more material omissions." Kaye v. Hirsch (In re Hirsch), 14 B.R. 59, 61 (Bankr. S.D. Fla. 1981).

wrongful intent in more material omissions." Kaye v. Hirsch (In re Hirsch), 14 B.R. 59, 61 (Bankr. S.D. Fla. 1981).

F.    Debtors Testified Falsely at Their Meeting of Creditors About the Disposition of Insurance Proceeds Received From State Farm.

"The false oath which is sufficient ground for denying discharge may consist of a false statement made by the debtor at an examination during the course of the proceedings including, inter alia, statements made at the section 341 meeting." Lissack Enterprises, Inc. v. Braidis (In re Braidis), 27 B.R. 470, 472 (Bankr. E.D. Penn. 1983). At their Meeting of Creditors, Debtors testified (under questioning from attorney Mark L. Hoose) that some of the State Farm insurance money was claimed by their mortgage company and they did not spend any of the insurance money except for $5,000.00 which they paid to Plaintiff (Undisputed Facts, ¶ 12):

Q.    And did you receive any insurance proceeds to cover the work that was done by Red River?
A.    Yes.
Q.    And what did you do with those insurance proceeds?
A.    Went through the mortgage -- the mortgage companies –
        LILLIE CALLOWAY:  Re-deposited it.
        MICHAEL CALLOWAY:  Re-deposited it.
BY MR. HOOSE:
Q.    Okay.  Is the money then - is the money still at the mortgage company waiting to be paid or was it sent –
A.    No, they got it all.
        LILLIE CALLOWAY:  They deposited.
BY MR. HOOSE:
Q.    The mortgage company?
A.    Uh-huh, and they released part of it, and that is when we paid them a portion and the rest of it they took.
Q.    Approximately how much money did the mortgage company take?
        LILLIE CALLOWAY: Like 2,000 –
        MICHAEL CALLOWAY:  Yes.
MR. HOOSE:
        How much?
        LILLIE CALLOWAY:  I don't know exactly the amount.
BY MR. HOOSE:
Q.    How much money was the total insurance loss?  Weren't you supposed to

22

> be receiving a check for approximately $60,000 for the damages to the home?
>
> A.   How much?
>
> LILLIE CALLOWAY:  Like 2,000 or so.
>
> BY MR. HOOSE:
>
> Q.   What was the amount of the insurance loss that you recall?
>
> A.   I don't know the total amount.
>
> Q.   Do you have any documentation related to that?
>
> LILLIE CALLOWAY:  We have the amount.
>
> MICHAEL CALLOWAY:  The amount.
>
> LILLIE CALLOWAY:  That we got paid.
>
> MICHAEL CALLOWAY:  The amount of what we got paid.
>
> LILLIE CALLOWAY:  That's all.
>
> MICHAEL CALLOWAY:  And that's all we had.
>
> BY MR. HOOSE:
>
> Q.   Can you provide that to your attorney?
>
> A.   Yes.
>
> Q.   Who was your insurance company?
>
> A.   State Farm.
>
> Q.   State Farm.  And you did not receive any of that money which you used for your own use?
>
> A.   No.

(Undisputed Facts, ¶ 12); Transcript of Meeting of Creditors, Appendix PX-2, p. 7, line 7 through p. 9, line 10.  Debtors deposited the check for $30,465.63 into their TFCU Account, No. xxxxxx9737, and spent the same on their living.  (Undisputed Facts, ¶ 12).  Debtors' mortgage company claimed none of it.  (Undisputed Facts, ¶ 12).

It is unclear what Debtors' motivation would be for this testimony.  Nonetheless, they did not state the truth.  This false testimony was material - the insurance check (which was $30,465.63, not $2,000.00) was supposed to be paid to Plaintiff for the roofing job.  Plaintiff was trying to determine at the 341 meeting what had happened to its promised payment.  Debtors testimony mislead Plaintiff who had to "dig" and investigate to get at the true facts.  This. it is not supposed to have to do.  Haverland, 150 B.R. at 770.  Debtors have compelled Plaintiff to engage in the "laborious tug-of-war to drag the simple truth into the glare

of daylight." Crane v. Morris (In re Morris), 302 B.R. 728, 739 (Bankr.  N.D. Okla. 2003) quoting Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir.  1987).  This is true on many issues, not just this one.

4.

Debtors Have Made False Oaths About
 Their Prepetition Income.

A.    Debtors Have Falsely Reported Their Income in Their SOFA.

Debtors' reported  income from all sources for the following periods is as follows:

2009 (YTD)--$38,433.91;
2008------------$33,165.00; and
2007------------$50,444.00.

(Undisputed Facts, ¶ 9). (Debtors' prepetition monthly mortgage payments total $4,911.74. (Undisputed Facts, ¶ 9). Debtors' vehicle payments totaled $563.00 per month. (Undisputed Facts, ¶ 9).  Debtors' Statement of Intention states that they intend to reaffirm on these debts. (Undisputed Facts, ¶ 9).  To service just these debts (not counting their many other extravagant living expenses), Debtors would need income of over $65,000.00 per year.  Curiously, Debtors' reported tithe income of $250.00 per week would amount to a gross income of at least $130,000.00 per year (i.e., $250.00 per week x 52 weeks x 10), or even more if they tithe on their net income (as opposed to their "gross").  Thus, their own reported tithe data impeaches the truthfulness of their income disclosures.

B.    Debtors' Lifestyle Shows They Have Under Reported Their Income.

At the 2004 examination, Mr. Calloway testified that he did mowing and home repair jobs to make up the mortgage/car payment shortfall, but has no way to prove it:

Q.    So your testimony - Mr. Calloway, are you testifying under oath that you
        make up a $2,500.00 per month shortfall just in your car payments and

24

> house payments, that you make up that shortfall by doing odd jobs like mowing and home repair?
> A.     Been doing it for 20 years.
> Q.     But you don't have any checks to prove that?
> A.     Correct.
> Q.     Because people just pay you cash?
> A.     Except for Mr. Gillespie.  He paid me checks.

See Excerpt from 2004 Examination, Appendix PX-39, p. 79, lines 6 through 17.

Debtors' year to date reported income for 2009 was $38,433.91.  (Undisputed Facts, ¶ 9). However, for the eleven month period of December 2008 through October 2009, Debtors had deposits to their trust bank accounts of $154,189.16 (Undisputed Facts, ¶ 16).  When the State Farm insurance money is deducted (i.e., $36,129.92), this leaves $118,059.24.  "Deposits in an individual's bank account are prima facie evidence of income."  King, 272 B.R. at 296.  This averages out to be $10,732.65 per month in income for this eleven month period!  (Undisputed Facts, ¶ 16).  Debtors received $7,785.37 in October 2009 (the same month as they filed bankruptcy).  (Undisputed Facts, ¶ 16).  The non-disclosure of income is material because it hid not only their income, but also their financial history, business dealings, and the fact that their expense schedules were materially false.  See Chalik, 748 F.2d. at 618 quoting Mascolo, 505 F.2d at 277-78.  When Mr. Calloway was asked at the 2004 exam how he made up the short fall in his income, this would have been an excellent time for him to come clean and disclose the true sources and amounts of Debtors' income (to include that they were receiving money on the VEMAC transfer).

The falsity of Debtors' reported income is even more apparent when one considers their elaborate life style.  Debtors's prebankruptcy lifestyle included paying for educational and sports training for one or both of their sons at IMG Academy and St. Leo's Academy, both in Florida. (Undisputed Facts, ¶s 13-14).  The amount of money paid by Debtors to these schools between

December 1, 2008 and June 1, 2009 totaled $20,300.99. (Undisputed Facts, ¶ 10). For the period of November 4, 2008 through May 26, 2009, Debtors spent $3,672.50 (at least) on a tutor (Kace King) for one or both of their sons. (Undisputed Facts, ¶ 10).

One need only to look at the picture of their house (with tennis courts) (Appendix PX s 69-70) and conclude that Debtors are not affording that house and private schools on $38,433.91 (YTD)[14] in income they report for 2009. Again, Debtors' non-disclosure of their income and all sources is material because it hid not only their income, but also their financial history, income producing business dealings, and the fact that their expense schedules were materially false. Chalik, 748 F.2d. at 618 quoting Mascolo, 505 F.2d at 277-78.

5.
### Debtors' False Oaths Were Made With The Requisite Fraudulent Intent and Justify The Denial of Discharge.

"The problem in ascertaining whether a debtor acted with fraudulent intent is difficult because, ordinarily, the debtor will be the only person able to testify directly concerning his intent and he is unlikely to state that his intent was fraudulent." Calder, 907 F.2d at 956. A creditor is not required to obtain an admission of fraudulent intent from the debtor. Ingersoll, 106 B.R. at 292. The requisite fraudulent intent may be shown by circumstantial evidence or by inferences drawn for a debtor's course of conduct. See id. "The bankruptcy court's ultimate determination concerning fraudulent intent will not be set aside unless clearly erroneous." Calder, 907 F.2d at 956. The materially false statement about the value received for the VEMAC transfer was knowingly and intentionally made with intent to deceive. (Undisputed Facts, ¶ 5). The court should deny the Debtors a discharge on this point alone.

---

[14] The court should note that the Debtors do not report retirement account "income" distributions in their SOFA as a source of income.

Additionally, a pattern of non-disclosure or falsehood can be a significant factor in determining fraudulent intent, for discharge denial purposes. King, 272 B.R. at 303. There is a pattern here of non-disclosure and falsehood that evidences fraudulent intent:

Debtors have, or have had, involvement and business dealings with companies they have not disclosed. (Undisputed Facts, ¶ 1-6).

Debtors said they received nothing for the VEMAC transfer, yet actually received at least $16,750.00. (Undisputed Facts, ¶ 5).

Debtors have failed to disclose their interests in one or more life insurance policies. (Undisputed Facts, ¶ 8).

Debtors spent $23,973.49 (at least) for their children to receive private education/sports training at Florida academies (Undisputed Facts, ¶ 10), yet they claim to have made only $38,433.9 (YTD) in 2009, and $33,165.00 in 2008) (Undisputed Facts, ¶ 9).

Debtors failed to report in their SOFA insurance losses (Undisputed Facts, ¶ 11), and gave false testimony at their Meeting Creditors about the amount they received from State Farm and how the money was spent (Undisputed Facts, ¶ 12).

Debtors failed to disclose three bank accounts (either as open or closed) from two of which we see large amounts of cash being spent on a debit/swipe card in Florida where, coincidentally, their sons attend private academies. (Undisputed Facts, ¶s 13-14).

Debtors failed to disclose their interests in the Calloway Trust (Undisputed Fact, ¶ 16) and trust bank account deposits in the pre-bankruptcy 11 month period were $154,189.17.

Debtors testimony at their Meeting of Creditors is at variance with their Schedules, SOFA, and Mr. Calloway's 2004 examination - Bank of India v. Sapru (In re Sapru), 127 B.R. 306, 316 (Bankr. E.D. N.Y. 1991).

Debtors state under oath that they do not own any books or CDs. (Again, little things add up to show fraudulent intent on bigger things - Kaye, 14 B.R. at 61).

Debtors have utterly failed or refused to amend their schedules (Undisputed Facts, ¶ 1), and this evidences reckless indifference to the truth (which is the same as fraudulent intent - Nazarian, 18 B.R. at 147).

Even where a number of false statements considered in isolation would not be

27

sufficient to deny a debtor a discharge under § 727(a)(4)(A), a number of discrepancies, omissions and falsehoods viewed together can be sufficient to support non-dischargeability. See Montey, 159 B.R. at 113; Community Bank of Homewood-Floosmoor v. Bailey (In re Bailey), 145 B.R. 919, 929 (Bankr. N.D. Ill. 1992 ). "[T]hose who seek the shelter of the bankruptcy court are not to "play fast and loose with their assets or with the reality of their affairs.'" King, 272 B.R. at 291 quoting Tully, 818 F.2d at 110 (cumulative effect evidences reckless indifference to the truth). This is exactly the situation here. There are simply too many errors, omissions, and falsehoods, combined with explanations and statements under oath that defy reality. Even if Debtors did not have actual fraudulent intent, their conduct evidences "reckless indifference" to the truth, which is the equivalent of fraudulent intent. King, 272 B.R. at 303. Id. at 302. Do these Debtors deserve a discharge, and will granting that discharge be in the spirit and letter of our bankruptcy laws? Plaintiff submits that each of these questions must be answered "no."

In denying a discharge in a 727(a)(2) and (a)(4) case, the Ingersoll court held:

> In light of the foregoing, it is unnecessary for this Court to dwell on each and every transaction on which the Debtor is alleged to have committed a fraud. This Court is satisfied that the Debtor's action in this case reflect a patter of deception and deceit which is unrebutted.

Ingersoll, 106 B.R. at 293. This court should reach a similar conclusion here.

6.

### Debtors Have Admitted That They Should Be Denied A Discharge Under 11 U.S.C. § 727(a)(4).

On June 3, 2010, Plaintiff served certain request for admissions upon Defendants. Request for Admission No. 4 stated:

28

Admit that your bankruptcy schedules and Statement of Financial Affairs filed with this court are materially false, constitute a "false oath" under the standards applicable to 11 U.S.C. § 727(a)(4), and that you (and each of you) should be denied a discharge.

Debtors' responses were due no later than July 6, 2010. (Undisputed Facts, ¶ 17). They did not respond. Debtors have admitted that they should be denied a discharge under 11 U.S.C. § 727(a)(4). (Undisputed Facts, ¶17).

<u>IV.  CONCLUSION</u>

For the foregoing reasons, Plaintiff asks that this court grant it summary judgment against Defendants on its claim under 11 U.S.C. § 727(a)(4). Plaintiff asks that the court enter an order denying the Debtors their discharge. Plaintiff also requests that the court's order grant Plaintiff all other relief to which Plaintiff is entitled, to include any costs and attorney fees allowed by law.

Respectfully submitted,

/s/ David L. Nunn
DAVID L. NUNN, OBA # 14512

-Of the Firm-

DAVID L. NUNN, P.C.
PO Box 230
Edmond, Oklahoma 73083-0230
(405) 330-4053
(405) 330-8470 (fax)
ATTORNEY FOR PLAINTIFF

29

CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2010 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit the above and foregoing pleading to the ECF registrants, to include the following:

Herbert M. Graves Ustpregion20.oc.ecf@usdoj.gov
David L. Nunn dnunn@davidlnunnpc.com

This is to further certify that the above and foregoing was mailed, postage prepaid, on the 17 day of September 2010 to the following entities:

Michael L. Calloway              Lillie E. Calloway
PO Box 2031                      PO Box 2031
Edmond, OK 73083                 Edmond, OK 73083

                                 /s/ David L. Nunn
                                 David L. Nunn